782 So.2d 452 (2001)
Retina Rybolt POULIN, et al., Appellants,
v.
Carlos FLEMING, M.D., et al., Appellees.
No. 5D99-2592.
District Court of Appeal of Florida, Fifth District.
March 16, 2001.
Rehearing Denied April 19, 2001.
Michael D. Martin of Martin & Martin, P.A., Lakeland, and Douglas K. Burnetti of Burnetti, P.A., Lakeland, for Appellant.
Jennings L. Hurt, III and Mary Gannon McMurry, of Rissman, Weisberg, Barrett, Hurt, Donahue & McLain, P.A., for Appellees Orlando Healthcare Group P.A., Fleming, Cook and Marrioneaux.
Theodore R. Dempster of Law Offices of Steven M. Ziegler, P.A., Hollywood, for Appellee Prudential Health Care Plan, *453 Inc., etc. No Appearance for Appellee Carlos Fleming, M.D.
SHARP, W., J.
The Poulins, individually and on behalf of their child, Payton, appeal from a final summary judgment in favor of the appellee health care providers. The issue on appeal is whether the trial court was correct in excluding the Poulins' expert opinion testimony that their child's condition (schizencephaly) was caused by medical treatment given to his mother by appellees while she was pregnant. We conclude that the Poulins' evidence does not meet the standard for admissibility of scientific evidence in Florida. Accordingly we affirm the judgment.
In the late winter/early spring of 1994, Mrs. Poulin sought medical treatment from appellees for abdominal pain, vomiting and nausea. She was prescribed antinausea drugs and antibiotics for a possible urinary infection. A chest x-ray and upper and lower GI series, which involved the use of fluoroscopy and barium, were performed.
In May 1994, a pregnancy test was performed and Mrs. Poulin was found to be about twenty-one weeks pregnant. Payton was born in October. Several months later, he was diagnosed with schizencephaly, a severe brain malformation. The Poulins filed suit against her appellees, alleging that the radiation alone or in combination with the medications administered to her caused this condition.
At trial, the appellees moved to exclude the Poulins' expert opinion testimony on causation. After a hearing, the trial court granted the motion. The court found that the experts' opinions were not based on scientific principles or discoveries that were sufficiently established so as to have gained general acceptance in their field. The court also found that the experts were not qualified to present opinion testimony on the issue of the relationship between radiation exposure and schizencephaly. The court then entered summary judgment in favor of the defendants.
The issue of admissibility of expert testimony is governed by the Florida Evidence Code, section 90.702. This section provides:
Testimony by Experts.
If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.
Like its federal counterpart, Federal Rule of Evidence 702,[1] section 90.702 does not contain any requirement that there be general acceptance of a newly developed scientific technique or principle in the particular field in which it belongs. Berry v. CSX Transportation, Inc., 709 So.2d 552 (Fla. 1st DCA), rev. denied, 718 So.2d 167 (Fla.1998). The "general acceptance" test applied to scientific evidence was derived from Frye v. United States, 293 F. 1013 (D.C.Cir.1923). There, the court stated the test as follows:
Just when a scientific principle or discovery crosses the line between the experimental *454 and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
293 F. at 1014.
After the adoption of the Florida Evidence Code, disagreement arose as to whether the Frye test was still to be applied to determine the admissibility of novel scientific evidence. Berry. In Stokes v. State, 548 So.2d 188 (Fla.1989), the Florida Supreme Court acknowledged that the Frye test had come under criticism since its inception in 1923 as too harsh and inflexible. However, the court believed that the problems associated with the other recognized judicial approaches foreclosed their use and it reaffirmed application of the Frye test. The court explained its rationale as follows:
The underlying theory for this rule is that a courtroom is not a laboratory, and as such it is not the place to conduct scientific experiments. If the scientific community considers a procedure or process unreliable for its own purposes, then the procedure must be considered less reliable for courtroom use.
548 So.2d at 193-194.
A similar debate was ongoing in the federal courts concerning whether Frye or Federal Rule of Evidence 702 should govern the admissibility of scientific evidence. In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that the federal evidence code superceded the Frye test. Brim v. State, 695 So.2d 268 (Fla.1997); Hadden v. State, 690 So.2d 573 (Fla.1997). This in effect broadened the standard for admissibility of scientific opinion. Olvera v. State, 641 So.2d 120 (Fla. 5th DCA 1994).
Despite the federal adoption of a more lenient standard in Daubert, the Florida Supreme Court has continued to adhere to the use of the Frye test. Brim; Murray v. State, 692 So.2d 157 (Fla.1997); Hadden; Ramirez v. State, 651 So.2d 1164 (Fla.1995); Brim v. State, 779 So.2d 427 (Fla. 2d DCA 2000); Olvera. In Hadden, the court explained its reason for adhering to the Frye test:
Moreover, we firmly hold to the principle that it is the function of the court to not permit cases to be resolved on the basis of evidence for which a predicate of reliability has not been established. Reliability is fundamental to issues involved in the admissibility of evidence. It is this fundamental concept which similarly forms the rules dealing with the admissibility of hearsay evidence. As a rule, hearsay evidence is considered not sufficiently reliable to be admissible, and its admission is predicated on a showing of reliability by reason of something other than the hearsay itself. See § 990.802, Fla. Stat. (1995) ("Except as provided by statute, hearsay evidence is inadmissible."). This same premise underlies why novel scientific evidence is to be Frye tested. Novel scientific evidence must also be shown to be reliable on some basis other than simply that it is the opinion of the witness who seeks to offer the opinion. In sum, we will not permit factual issues to be resolved on the basis of opinions which have yet to achieve general acceptance in the relevant scientific community; to do otherwise would permit resolutions based upon evidence which has not been demonstrated to be sufficiently reliable and *455 would thereby cast doubt on the reliability of the factual resolutions.
690 So.2d at 578.
This higher standard of reliability in Frye requires a determination by the judge that the basic underlying principles of scientific evidence have been sufficiently tested and accepted by the relevant scientific community. To that end, the Florida Supreme Court has expressly held that the trial judge must treat new or novel scientific evidence as a matter of admissibility for the judge rather than as a matter of weight for the jury. Brim.
In Ramirez, the court delineated a four step process for applying Frye:
First, the trial judge must determine whether such expert testimony will assist the jury in understanding the evidence or in determining a fact in issue.... Second, the trial judge must decide whether the expert's testimony is based on a scientific principle or discovery that is `sufficiently established to have gained general acceptance in the particular field in which it belongs.' Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923) ... The third step in the process is for the trial judge to determine whether a particular witness is qualified as an expert to present opinion testimony on subject in issue.... Fourth, the judge may then allow the expert to render an opinion on the subject of his or her expertise, and it is then up to the jury to determine the credibility of the expert's opinion, which it may either accept or reject....
651 So.2d at 1167.
Thus in reviewing the admissibility of the Poulins' expert opinion testimony, we must apply the higher standard of reliability dictated by Frye. Our review of this Frye issue is de novo and considers the trial court's ruling as a matter of law rather than under the abuse of discretion standard. Hadden; Brim. Expert testimony, scientific and legal writings, and judicial opinions may be examined to aid in this determination and the issue of "general acceptance" may be considered at the time of the appeal. Hadden; Brim; E.I. Du Pont De Nemours & Co., Inc. v. Castillo, 748 So.2d 1108 (Fla. 3d DCA), cert. granted, 770 So.2d 156 (Fla. 2000); Berry.
According to the National Institute of Neurological Disorders and Stroke, schizencephaly is an extremely rare developmental disorder characterized by abnormal clefts in the brain's cerebral hemispheres. National Institutes of Health, National Institute of Neurological Disorders and Stroke, Schizencephaly (June 1997) Patients with this condition may have seizures, impaired motor function and intellectual levels ranging from normal to severe mental retardation. Sharp by Sharp v. Secretary of Dept. of Health & Human Services, 1991 WL 101622 (Cl.Ct.1991).
To support their claim that the radiation alone or in combination with the drugs given to Mrs. Poulin caused Payton's condition, the Poulins intended to call Dr. Laurie Barclay, Dr. Reuben Matalon and Dr. Ernest Sternglass. Dr. Barclay, a pediatric neurologist, believed that Mrs. Poulin was folic-acid deficient because she was recovering from an earlier pregnancy, which is known to deplete folic acid, and was nauseous, vomiting, and presumably was not eating well. Dr. Barclay opined that the combination of radiation, medications and folic acid deficiency caused the schizencephaly and that the radiation Mrs. Poulin received as part of the upper GI test was the single most important factor in causing Payton's condition.
However, Dr. Barclay admitted that she was not aware of any specific literature *456 linking folic acid to schizencephaly. As to the effect of radiation and medications, Dr. Barclay acknowledged that she was relying on the opinion of Dr. Sternglass. Dr. Barclay admitted that schizencephaly is an extremely rare defect and that she has never evaluated a person with this condition, other than Payton. When asked how much radiation a fetus must be exposed to in order to experience schizencephaly, Dr. Barclay admitted that she did not know the answer because schizencephaly is a very rare defect and the epidemiological data which are available do not have the power to detect a significant increase in the risk of schizencephaly radiation. Dr. Barclay admitted that there is no article or book that states there is a direct correlation between radiation exposure and schizencephaly.
Dr. Matalon, a pediatric geneticist, opined that the radiation received by Mrs. Poulin caused Payton's schizencephaly. When asked how much radiation must be present to have this effect, Dr. Matalon did not know as he had not researched this subject. Dr. Matalon was not aware of any reported case of schizencephaly in association with radiation exposure. Dr. Matalon could not remember any article or literature which supports the contention that radiation exposure can specifically cause schizencephaly, other than one article which discussed that the migrational defect can be caused by radiation. When asked to explain how radiation could affect migration, Dr. Matalon admitted that no one really knows. Dr. Matalon admitted that he was not aware of any article or literature which supports the contention that radiation causes schizencephaly. When asked whether there were any articles or literature which support the contention that folic acid has any effect on neural migration, Dr. Matalon admitted that there was none and that he was "projecting" because folic acid is important in cell division.
Dr. Ernest Sternglass, a Professor of Radiology at the University of Pittsburgh School of Medicine, opined that Payton's schizencephaly was caused by the radiation received by his mother. Dr. Sternglass believes that there is no safe level of x-radiation to a developing fetus between the eighth and fifteenth week of gestation, citing the Beir V Report. The Beir V Report was prepared by the Committee on the Biological Effects of Ionizing Radiation, Board of Radiation Effects, Research Commission on Life Sciences, National Research Council. The Beir V Report looked at the health effects of exposure to radiation from the atomic bombings of Hiroshima and Nagasaki. The Report found an increase in mental retardation for those persons who were exposed in utero to ionizing radiation.
However, Dr. Sternglass admitted that the Report involved mental retardation, not schizencephaly, and that mental retardation is only a symptom of schizencephaly. Dr. Sternglass also admitted that Payton's condition could be the result of his mother's exposure to natural background radiation, although he believed that it was much more likely that the condition was caused by the radiation from the medical tests. When asked whether there was a generally accepted cause for schizencephaly, Dr. Sternglass could not say because he has not studied the incidents of this particular condition because it is not his area of expertise. Dr. Sternglass has studied general forms of retardation but is not a diagnostic physician nor a medical doctor and has never seen a patient with schizencephaly. Dr. Sternglass admitted that he was not aware of any article or textbook which specifically associates radiation as a cause of schizencephaly and has not done a detailed search of the literature for that.
*457 We conclude that these expert opinions failed to meet the higher standard of reliability required by Frye. The experts could not point to one reported case of schizencephaly associated with exposure to radiation or a lack of folic acid and no scientific studies, data or literature to support their contentions. The experts did not know how much radiation might be required to cause schizencephaly and whether schizencephaly could be caused by exposure to background radiation. Dr. Barclay had never evaluated a person with schizencephaly, other than Payton, and Dr. Sternglass had never seen a patient with schizencephaly. Dr. Sternglass relied on the Bier V Report but this report shows only an increase in mental retardation, not schizencephaly. Mental retardation is a sign of schizencephaly but this condition may be caused by other factors. In sum, the experts' opinions were not shown to be reliable on some basis other than simply that they were their own opinions.
To support admission of their experts' testimony, the Poulins rely heavily on a short article on schizencephaly presented in the "Radiology Resident Case of the Week" on the "Virtual Hospital" web site. This article from 1996 was authored by Lorenzo Carson, whose qualifications are not stated. The article notes that most brain malformations can be produced by a variety of injuries during gestation, including infections, x-radiation, certain drugs, metabolic and genetic abnormalities. http://www.vh.org/Providers/Teaching-Files/RCW/042696/04696.html>.
However, this case study was not peer reviewed. Peer review and publication provide the opportunity for others in the field to examine and critique the reasoning or methodology behind the scientific theory. Williams v. State, 710 So.2d 24 (Fla. 3d DCA), rev. denied, 725 So.2d 1111 (Fla.1998). In deciding the admissibility of scientific evidence, the courts should consider the failure of experts to publish or submit their studies for peer review. Du Pont. While the failure to publish a study or conclusions for peer review does not necessarily render a conclusion inadmissible, courts should be skeptical of medical and other scientific evidence that has not been subjected to thorough peer review. See Du Pont.
We recognize the difficulty the Poulins have in proving causation because Payton's condition is so rare. However, caution is necessary in the area of admitting new scientific evidence:
The argument is sometimes made that waiting until an association found in one study is confirmed by others will mean that early claimants will be denied a recovery .... A related argument is that history tells us that the scientific community has been slow at times to accept valid research and its results. While these observations are true, history also tells us that valid and reliable research and theories are generally accepted quickly within the scientific community when sufficient explanation is provided and empirical data are adequate .... Our legal system requires that claimants prove their cases by a preponderance of the evidence. In keeping with this sound proposition at the heart of our jurisprudence, the law should not be hasty to impose liability when scientifically reliable evidence is unavailable. As Judge Posner has said, `[l]aw lags science; it does not lead it.'
Du Pont, 748 So.2d at 1121, quoting Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 727-28 (Tex.1997), cert. denied, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998).
At the hearing below, the Poulins' counsel conceded that without the expert testimony, he had no proof of causation and *458 that the defendants would be entitled to a directed verdict if the case were to go to trial. In the absence of evidence of causation, the trial court correctly entered judgment in favor of the defendants. See McCray v. Myers, 614 So.2d 587 (Fla. 1st DCA 1993) (summary judgment in favor of the defendants affirmed where proximate causation is lacking). See also Du Pont (in the absence of evidence of causation, the defendant's motions for directed verdict should have been granted).
AFFIRMED.
THOMPSON, C.J., and COBB, J., concur.
NOTES
[1] The federal rule provides:

Testimony by Experts.
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.